AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

DISTRICT OF __Massachusetts__

UNITED STATES OF AMERICA

V.

Eliomar Carlos DeOliveira Alves
127 washington Street, Brighton, MA
DOB: 5/3/60

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 2004M 0448 RBC

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __10/20/03, 10/21/03, 12/17/03__ in __Suffolk__ county, in the _____ District of __Massachusetts__ defendant(s) did, (Track Statutory Language of Offense)

knowingly transfer false identification documents which appeared to be issued under the authority of the United States, knowing such documents to be produced without lawful authority

in violation of Title __18__ United States Code, Section(s) __1028(a)(2)__

I further state that I am a(n) __ICE Special Agent__ and that this complaint is based on the following
                                    Official Title

facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

01-20-2004  _____  at   Boston, Massachusetts
Date                                              City and State

Robert B. Collings
United States Magistrate Judge     _____
Name & Title of Judicial Officer       Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## AFFIDAVIT OF SPECIAL AGENT RYAN ARNOLD

I, G. Ryan Arnold, having been duly sworn, do hereby depose and state as follows:

1. I am a Special Agent with the United States Bureau of Immigration and Customs Enforcement ("ICE") formerly known as the Immigration and Naturalization Service ("INS"), and have been so employed since May 1998. Among other duties, I am assigned to investigate the illegal manufacture and sale of fraudulent Immigration and Naturalization Resident Alien Cards, Form I-551 ( "green cards"). From my training, I know that persons, usually aliens, manufacture and distribute counterfeit green cards and Social Security Administration account number cards ("social security cards"). The counterfeit documents are then distributed and sold to aliens who are illegally in the United States. I am familiar with the various criminal statutes which make it unlawful to manufacture and sell fraudulent green cards and social security cards, including Title 18, United States Code, Section 1028(a)(1)-(6) (producing identification and false identification documents); and Title 18, United States Code, Section 1426(b) (using and selling false naturalization, citizenship and registry documents).

2. This affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and agents of this Service, as well as information provided to me by confidential informants ("CI"). This affidavit is not intended to set forth all of the information that I and other law enforcement personnel have learned during this investigation, but is submitted in support of criminal complaint.

3. I seek a criminal complaint charging Eliomar Carlos DEOLIVEIRA-ALVES, a/k/a Ediomar Alves, a/k/a "Mamado," and an individual only known as

"Carlos," with knowingly and without lawful authority transfering false identification documents which appeared to be issued under the authority of the United States, knowing that such documents were produced without lawful authority, in violation of Title 18, United States Code, Section 1028(a)(2).

## *BACKGROUND*

4. On April 29, 2003, I received information from Boston Police Detective Joaquim Adao Ceasar regarding a male, identified as Jorge VASCONCELLOS, a/k/a "Linquina," who was believed to be manufacturing and selling fraudulent green cards and social security cards in the Allston/Brighton area of Massachusetts.

5. On June 30, 2003, Jorge VASCONCELLOS sold one set of fraudulent documents to ICE service confidential informant MIR 017686 (hereinafter CI-1). A set of fraudulent documents includes one green card and one corresponding social security card.

6. On July 20, 2003, service confidential informant MIR 02160/SA-565-BO (hereinafter CI-2) met with VASCONCELLOS and placed an order for two sets of fraudulent documents, paying $100 in advance. Multiple attempts where made to contact VASCONCELLOS without success. Through intelligence sources, Boston Police Detective James Fong learned that VASCONCELLOS was believed to have fled the United States following an arrest by the Boston Police Department for a narcotics offense.

7. On September 29, 2003, I received information that another individual identified as Eliomar Carlos DEOLIVEIRA-ALVES, a/k/a Ediomar Alves, a/k/a "Mamado," had taken over VASCONCELLOS'S business of selling fraudulent

documents. CI-2 met with "Mamado" on three occasions and purchased a total of ten (10) documents directly from "Mamado." On one occasion "Mamado" was unable to meet with CI-2 and sent a person he identified as the document manufacturer, "Carlos," to meet with CI-2. "Carlos" delivered six sets of documents to CI-2 and told CI-2 to deal directly with him instead of going through "Mamado." Subsequently, "Carlos" produced and delivered ten additional sets. In total, 25 sets have been produced and delivered by "Mamado" and "Carlos."

## *THE DOCUMENT PURCHASES*

8. On October 14, 2003, under the direction of your affiant, CI-2 placed a consensually monitored and recorded call and one unrecorded call to "Mamado" at 617-438-5747 and made arrangements to meet on October 16, 2003 at the Café Brazil, located at 421 Cambridge Street in Allston, Massachusetts, for the purpose of negotiating the purchase of fraudulent documents.

9. Shortly before the scheduled meeting on October 16, 2003, ICE agents met with CI-2 and provided him/her with three photographs, each with corresponding biographical information written on the back, which were to be used on the fraudulent documents. In addition, ICE agents fitted CI-2 with an electronic monitoring and recording device.

10. On October 16, 2003, CI-2, wearing the electronic monitoring and recording device and under constant surveillance by ICE agents, met "Mamado" at a parking lot directly across the street from Café Brazil. "Mamado" arrived in a 1997 Gray Toyota Four Runner, Massachusetts registration number H23005. Massachusetts Registry of Motor Vehicle ("RMV") records list the car's owner as Eliomar Deolivera-Alves, with an

address of 127 Washington Street, Apartment #33, Brighton, Massachusetts. "Mamado" was seen entering CI-2's motor vehicle. Inside the vehicle, "Mamado" introduced himself as "Mamado" and stated that his real name was Eliomar. "Mamado" and CI-2 negotiated the sale of three sets of fraudulent documents for $180 per set. CI-2 provided "Mamado" with the three photographs to be used on the green cards.

11. On October 20, 2003, at approximately 5:15 p.m., CI-2, wearing an electronic monitoring and recording device and under constant surveillance by ICE agents, proceeded to the parking lot across from Café Brazil. "Mamado" arrived at the parking lot driving the same Toyota Four Runner. "Mamado" entered CI-2's car and exchanged three sets of documents for $540.00 in cash. After the exchange, CI-2 negotiated an additional order for two sets of fraudulent documents. CI-2 provided "Mamado" with two pictures and corresponding biographical information to be used on the documents. "Mamado" agreed to deliver the documents the following day. After the meeting, CI-2 proceeded to a prearranged location and turned over the documents to ICE agents. The green cards contained the pictures that had been provided previously by CI-2, and the documents contained the biographical information which had also been provided. ICE determined that the numbers on all of the documents were either invalid or belonged to someone other than the person listed on the document.

12. On October 21, 2003, at approximately 9 a.m., CI-2, wearing an electronic monitoring and recording device and under constant surveillance by ICE agents, proceeded to the parking lot across from Café Brazil. At approximately 9:14 a.m., "Mamado" arrived at the parking lot driving the Toyota Four Runner. "Mamado" entered

CI-2's car and delivered two sets of fraudulent documents. CI-2 handed "Mamado" $360 in cash; "Mamado" kept $300 and returned $60 to CI-2.

13. Between November 15, 2003, and November 19, 2003, under the direction of your affiant, CI-2 made arrangements to meet "Mamado" through a series of unrecorded calls for the purpose of negotiating the sale and transfer of six sets of documents. On November 19, 2003, "Mamado" contacted CI-2 and stated that he would not be able to meet with CI-2, but he would send the document manufacturer, "Carlos," in his place. Arrangements were made to meet on November 20, 2003, at the Hess gas station on the corner of Cambridge Street and North Harvard Street in Allston, Massachusetts.

14. Shortly before the scheduled meeting on November 20, 2003, ICE agents met with CI-2 and provided him/her with six photographs, each with corresponding biographical information written on the back, which were to be used on the fraudulent documents. In addition, ICE agents fitted CI-2 with an electronic monitoring and recording device. At approximately 1:27 p.m., CI-2, wearing an electronic monitoring and recording device, and under constant surveillance by ICE agents, proceeded to the Hess gas station. At approximately 1:39 p.m., "Carlos" met with CI-2 at the Hess gas station. According to CI-2, CI-2 provided "Carlos" with six sets of photographs with corresponding biographical information written on the back, and "Carlos" agreed to produce and deliver six sets of documents on the same day. At approximately 1:40 p.m. the meeting between CI-2 and "Carlos" ended. "Carlos" got into a Blue 1996 Plymouth Voyager, Massachusetts registration number 20HA29. Under continuous surveillance, "Carlos" was followed directly to 15 Leicester Street in Brighton, Massachusetts. "Carlos" did not make any stops on the way. ICE agents observed "Carlos" exiting the

van and entering the apartment complex at the address listed above. According to Massachusetts RMV records, the address listed on the Voyager van's registration is 15 Leicester Street, Apartment C, Brighton, Massachusetts. The van was registered to a Marcelo Coelho. According to RMV records, there is no active driver's license under the name Marcelo Coelho. Thus, ICE was unable to confirm the identity of "Carlos." However, one of the four names appearing on the mailbox for Apartment C at 15 Leicester Street in Brighton, Massachusetts is Marcelo Coelho. The others are Ana Moreira, Wadilson Sorge, and Rogerio Aguiar.

15. At approximately 1:56 p.m., CI-2 placed a consensually monitored and recorded call to "Carlos" and stated that he/she would not have the money on that day and inquired if "Carlos" would be willing to meet the following day to deliver the documents. "Carlos" stated that he would deliver the documents without payment that day (November 20, 2003) and that CI-2 could pay him by depositing the money into a bank account the following day.

16. At approximately 3:05 p.m., ICE agents performing surveillance outside of 15 Leicester Street, Brighton Massachusetts, observed "Carlos" exit the apartment building and get into the Voyager van. "Carlos" drove to a Citizens Bank on Washington Street and then to the Café Brazil in Allston. At approximately 3:14 p.m., "Carlos" arrived at the Café Brazil in Allston and met with CI-2 inside of the restaurant. At approximately 3:45 p.m., CI-2 and "Carlos" exited the restaurant together. "Carlos" went to the Voyager van, retrieved the six sets of documents, and gave them to CI-2. At approximately 3:48 p.m. the meeting ended and both left the area. CI-2 proceeded to a prearranged location and turned over the documents to ICE agents. The green cards

contained the pictures that had been provided previously by CI-2, and the documents contained the biographical information which had also been provided. ICE determined that the numbers on all of the documents were either invalid or belonged to someone other than the person listed on the document.

17. On November 21, 2003, at approximately 7:00 a.m. "Carlos" contacted CI-2 during an unrecorded call. "Carlos" instructed CI-2 to deposit the money into Fleet Checking Account Number 14081042, which, according to "Carlos," was held under the name Antonio Marcos Pinto. "Carlos" placed several unrecorded calls throughout the day asking if CI-2 had deposited the money in the account. According to CI-2, "Carlos" stated that "Pinto" needed the money by 3:00 p.m. At about 3:30 p.m. CI-2 contacted "Carlos" and stated that he/she would not have the money until the following Monday.

18. On November 24, 2003, "Carlos" contacted CI-2 through an unrecorded phone call and made arrangements to meet at 11:30 a.m. at the Oasis restaurant at 910 Gorham Street, Lowell, Massachusetts so that CI-2 could deliver the money. Equipped with a monitoring and recording device, and under constant surveillance by ICE agents, CI-2 proceeded to the restaurant. At approximately 11:14 a.m, CI-2 met briefly with "Carlos." Realizing that ICE agents forgot to provide CI-2 with the $900 in official funds, CI-2 told "Carlos" that he/she would be right back. CI-2 drove around the block and met with ICE agents, who then provided the $900 in official funds. At approximately 11:23 a.m, CI-2 returned to the Oasis restaurant and met with "Carlos." "Carlos" and CI-2 engaged in conversation, concluding with CI-2 paying "Carlos" the $900.00 cash. During the course of their conversation, "Carlos" stated that he and "Mamado" had an altercation over the fact that "Carlos" was meeting directly with CI-2.

"Carlos" told CI-2 that CI-2 could meet with him directly and that he would do the documents for less. At approximately 11:26 a.m. the meeting terminated. "Carlos's" van was observed parked outside of the Oasis restaurant by ICE agents conducting surveillance.

19. On December 8, 2003, under the direction of your affiant, CI-2 attempted to call "Carlos" at 617-839-1312. "Carlos's" phone had been disconnected. CI-2 then contacted "Mamado." Through several unrecorded phone calls placed over the course of December 8, 2003, through December 12, 2003, CI-2 and "Mamado" made arrangements to meet on December 16, 2003 at the Café Brazil in Allston for the purpose of negotiating the sale and transfer of five sets of fraudulent documents.

20. Shortly before the scheduled meeting on December 16, 2003, ICE agents met with CI-2 and provided him/her with five photographs, each with corresponding biographical information written on the back, which were to be used on the fraudulent documents. In addition, ICE agents fitted CI-2 with an electronic monitoring and recording device. At approximately 11:25 a.m., CI-2, wearing an electronic monitoring and recording device, and under constant surveillance by ICE agents, proceeded to Café Brazil. At approximately 11:33 a.m., "Mamado" arrived at the Café Brazil driving his Toyota Four Runner. "Mamado" met with CI-2. CI-2 provided "Mamado" with the five photographs with corresponding biographical information written on the back. "Mamado" agreed to deliver the documents for $140.00 per set and agreed to deliver them at approximately 3:00 p.m. the same day. "Mamado" stated that he was unsure where "Carlos" was and that he had lost contact with him approximately fourteen days prior. "Mamado" stated that he was using another document manufacturer named

"Bruno." At approximately 11:48 a.m. the meeting ended. ICE agents conducted moving surveillance on "Mamado" as he left the meeting. He was followed to a restaurant in Cambridge. Surveillance was terminated after ICE agents learned that "Mamado" would not be delivering the documents that day (See paragraph 23 below).

21. At approximately 1:30 p.m., "Mamado" contacted CI-2 through an unrecorded call and stated that "Bruno" was stuck in traffic and that he would not be able to deliver the documents at 3:00 p.m. CI-2 made arrangements to meet the following day at 2:00 p.m. at the Brazilian Legal Store in Somerville, Massachusetts.

22. On December 17, 2003, CI-2, wearing an electronic monitoring and recording device, and under constant surveillance by ICE agents, proceeded to the meet location. At approximately 2:30 p.m., "Mamado" arrived at the Brazilian Legal Store parking lot driving his Toyota Four Runner. "Mamado" met with CI-2 and gave him/her five sets of documents in exchange for $700.00 in cash. After the meeting, CI-2 proceeded to a prearranged location and turned over the documents to ICE agents. The green cards contained the pictures that had been provided previously by CI-2, and the documents contained the biographical information which had also been provided. ICE determined that the numbers on all of the documents were either invalid or belonged to someone other than the person listed on the document.

23. Also on December 17, 2003, at approximately 12:38 p.m, "Carlos" contacted CI-2 during an unrecorded phone call. "Carlos" stated that he had been at a casino for the past fifteen days and had lost approximately $20,000. "Carlos" told CI-2 that he could contact him directly in the future, and that he would produce documents for CI.-2. "Carlos" told CI-2 to contact him at 617-216-2159. "Carlos" further stated that his old

cellular phone, 617-839-1312, would soon be turned back on and that CI-2 could contact him using that number.

24. On January 2, 2004, under the direction of your affiant, CI-2 contacted "Carlos" through a series of unrecorded phone calls and made arrangements to meet on January 8, 2004, for the purpose of negotiating the sale and transfer of ten sets of fraudulent documents.

25. On January 8, 2004, at approximately 6:43 p.m, CI-2 placed a consensually monitored and recorded call to "Carlos" and made arrangements to meet within a few minutes at the Hess gas station at the intersection of Cambridge Street and North Harvard Street in Allston..

26. Shortly before the scheduled meeting on January 8, 2003, ICE agents met with CI-2 and provided him/her with ten photographs, each with corresponding biographical information written on the back, which were to be used on the fraudulent documents. In addition, ICE agents fitted CI-2 with an electronic monitoring and recording device. CI-2 then proceeded to the meet location.

27. At approximately 6:53 p.m., ICE Agents conducting surveillance outside of 15 Leicester Street observed "Carlos" exit the apartment building and get into the blue 1996 Plymouth Voyager, Massachusetts registration number 20HA29.

28. At approximately 7:02 p.m., ICE agents observed "Carlos" arriving at the Hess gas station. "Carlos" exited his van and got into CI-2's vehicle. According to CI-2, "Carlos" accepted the ten (10) photographs and agreed to manufacture and transport the documents within the following hour and a half. During their conversation, "Carlos" offered to sell to CI-2 all of his document-manufacturing equipment, including a

computer and computer software, for $3000. CI-2 told "Carlos" that he/she was not sure but would get back to him soon. At approximately 7:09 p.m. the meeting ended. "Carlos" exited CI-2's vehicle and reentered his van. ICE agents conducted continuous mobile surveillance, following "Carlos" from the Hess gas station directly back to 15 Leicester Street. "Carlos" did not make any stops on the way. At approximately 7:18 p.m., ICE Special Agent Dacunha, who was conducting surveillance inside of 15 Leicester Street by roaming the hallways of the building, observed "Carlos" enter Apartment C on the second floor. SA Dacunha was familiar with "Carlos's" appearance from having been part of the surveillance teams during prior meetings and transactions between "Carlos" and CI-2.

29. At approximately 8:30 p.m., in anticipation of "Carlos" completing the documents and exiting Apartment C, SA Dacuhna returned to the second floor hallway. SA Dacunha observed "Carlos" exit Apartment C. "Carlos" got into his van and drove directly to the Hess station under constant surveillance by ICE agents. "Carlos" did not make any stops along the way.

30. At approximately 8:39 p.m., "Carlos" arrived at the gas station and met with CI-2. According to CI-2, "Carlos" delivered the ten (10) sets of documents and CI-2 paid "Carlos" $1000 in official government funds. At approximately 8:49 p.m. the meeting ended and "Carlos" left the area.

31. After the meeting, CI-2 proceeded to a prearranged location and turned over the ten sets of documents to ICE agents. The green cards contained the pictures that had been provided previously by CI-2, and the documents contained the biographical information which had also been provided. ICE determined that the numbers on all of

the documents were either invalid or belonged to someone other than the person listed on the document.

*CONCLUSION*

32. Based on the foregoing information, I believe probable cause exists to conclude that on October 20, 2003, October 21, 2003, and December 17, 2003, Eliomar Carlos DEOLIVEIRA-ALVES, a/k/a Ediomar Alves, a/k/a "Mamado," did knowingly, and without lawful authority transfer false identification documents which appeared to be issued under the authority of the United States, knowing that such documents were produced without lawful authority, in violation of Title 18, United States Code, Section 1028(a)(2). I also believe probable cause exists to conclude that on November 20, 2003, and January 8, 2004, "Carlos" did knowingly, and without lawful authority transfer false identification documents which appeared to be issued under the authority of the United States, knowing that such documents were produced without lawful authority, in violation of Title 18, United States Code, Section 1028(a)(2).

_____
Ryan Arnold
Special Agent
Department of Immigration and
Customs Enforcement

Subscribed and sworn to before me this twentieth day of January, 2004.

_____
Robert B. Collings
United States Magistrate Judge